# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 13-cr-576 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| MARIA MORENO ) | |

## MEMORANDUM OPINION AND ORDER

The United States of America ("Government") has charged Defendant Maria Moreno ("Defendant") and her alleged co-conspirators with various narcotics offenses. Before the Court are: (1) the Government's evidentiary proffer pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978) [259]; and (2) Defendant's motion *in limine* to bar certain opinion testimony [280]. For the reasons stated below, the Court accepts the Government's *Santiago* proffer [259] and concludes that the co-conspirator statements set out by the Government are admissible pending the introduction of the evidence underlying the proffer. The Court denies Defendant's motion *in limine* [280] without prejudice as moot because the Government has represented that it does not intend to introduce the testimony that Defendant seeks to exclude.

**I.     Background**

The Government indicted Defendant and five co-defendants—Miguel Guzman, Alfredo Torres, Sergio Zacahua, Acasio Sanchez, and Fabian Foster—for their alleged participation in a conspiracy to distribute heroin and cocaine in the Chicago, Illinois and Detroit, Michigan areas. According to the Government, Guzman was the head of the drug trafficking organization (the "Guzman DTO") and Defendant received narcotics from Chicago-based members of the Guzman DTO—including Torres—to further distribute in the Detroit area.

While investigating the Guzman DTO, the Government conducted physical surveillance and also placed court-authorized wiretaps on the phones of Torres and others to capture discussions about narcotics trafficking activities. The first group of recorded conversations cited by the Government in its *Santiago* proffer centers on Defendant's alleged receipt from Torres of a car containing a hidden "trap" compartment to conceal narcotics. Around noon on May 17, 2013, Torres and Guzman spoke on the phone and Guzman said, "[if] that lady [Defendant] calls and she is coming tomorrow [to pick up narcotics proceeds], tell her to give you a day. Tell me so I can put the radio, because it is going to be embarrassing to leave it with a fucking hole [meaning, Guzman had not yet finished fixing the radio, which had been removed from the car]." [259] at 17.[1]

Four days later, on May 21, Torres and Moreno spoke on the phone about Moreno flying from Washington State to Chicago, Illinois, and "from there [she] would take a taxi to go over there and pick up the truck." *Id.* at 18. The next day, Torres and Moreno spoke again and discussed when Moreno would arrive in Chicago. The following day, May 23, surveillance observed Defendant in Chicago driving a car registered to Individual A, who shared an address with Defendant in Michigan. On the afternoon of May 27, Torres and Defendant had a conversation about where to meet in Chicago for Torres to give Defendant keys. Surveillance then observed Defendant and Torres standing outside of their vehicles and speaking together at a gas station in Chicago. Defendant then drove to a nearby restaurant, got out of her vehicle, entered another vehicle, and drove off.

---

[1] The portions of the quotes to recorded conversations which are in brackets are law enforcement officers' interpretations of the call participants' language. See [259] at 17-18 & n.3. The Government represents that it "intends to call as a witness one of the participants in these conversations to testify regarding his understanding of the conversation." *Id.* at 18 n.3.

2

Early that evening, law enforcement officers conducted a traffic stop of Defendant in Porter County, Indiana. The officers placed a hold on the vehicle pursuant to their internal policy because Defendant was not the registered owner of the vehicle and could not explain her relationship to the registered owner. The officers conducted an inventory search of the vehicle and found an empty concealed compartment hidden in the trunk and a receipt from a glass company with the name "Alfred Torres" on it. After the traffic stop, Defendant had a phone conversation with Torres. This conversation is the basis for Count Nine of the indictment against Defendant. Defendant told Torres, "Uh . . . drop those phones. They [law enforcement] took the truck away from me." [259] at 20. Torres responded, "Shit, okay." *Id.* Defendant replied: "They [law enforcement] were following me from there [meaning, from where Moreno had met with Torres]. I'll come down there [back to Chicago] on Wednesday. I'll meet you at 4:00. I won't call you anymore." *Id.* Later that night, Defendant and Torres had another phone conversation. Moreno told Torres that "[t]hey took it [the truck] because it wasn't in my name." *Id.* Torres asked, "[b]ut they didn't find anything [narcotics]?" Defendant responded, "[w]ell, there was nothing, I don't think so." *Id.* Torres said "I hope nothing happens, because I had some receipts in there from the window with my name on it." *Id.*

On April 7, 2013, Individual A (who had the same Michigan address as Defendant) was arrested after receiving four kilograms of heroin from Zacahua at Torres' direction.

The second group of conversations that the Government discusses in its *Santiago* proffer relates to the Guzman DTO's alleged attempt to distribute heroin to Defendant on July 15-16, 2013. According to the Government, it will present evidence showing that Guzman delivered four kilograms of heroin to Foster, who in turn was supposed to deliver the heroin to Moreno. On the morning of July 15, Guzman told Torres to "call the lady [Moreno]" and "[m]ake

arrangements with her." [259] at 21. Torres told Guzman that he had tried to call her the previous day and she did not answer, and questioned whether the number "could be her mom's phone." *Id.* Guzman told Torres, "tell her that Fabian [co-defendant Fabian Foster]. Just say Fabian." *Id.* Torres then had a phone conversation with Foster and asked Foster if he would be "ready maybe later . . . afternoon or tomorrow"? *Id.* Foster responded, "Okay." *Id.* Torres replied, "I'll let you know. I'm going to talk to that lady [Moreno.]" *Id.* Later in the conversation, Foster stated, "I'm going to get a phone . . . Yeah, I'm going to get my phone and call you back." *Id.* About half an hour later, Torres had a phone conversation with Defendant. Torres said, "I called you yesterday and you didn't answer me anymore." Defendant responded that "the battery died out" and she "didn't notice it." *Id.* Torres told Defendant: "Well, we found this friend [Foster] already. I'll call you later on because he's going to call me in about two hours." *Id.* Defendant and Torres then discussed when Foster would arrive and Torres stated, "Okay, I'm going to tell him [Foster] if he can arrive before nine, if not he can leave tomorrow." *Id.* at 22.

Around noon the same day, Torres had a phone conversation with Guzman and discussed the arrangements that he had made with Foster and Moreno. Guzman told Torres to "Tell her to be ready okay?" and Torres replied "okay." [259] at 22. About an hour later, at 1:09 p.m., Torres had a phone conversation with Defendant. This conversation is the basis for Count Eleven of the indictment against Defendant. Defendant asked, "What did the man [Foster] say"? [259] at 22. Torres responded, "Well, right now he told me he was going to get a phone and that he was going to call me, but I think it's going to be too later already, right?" *Id.* Defendant replied, "Uh-huh." *Id.* Torres asked, "During the day would be good, right, Whatever time during the day?" *Id.* at 23. Defendant replied, "Yes." *Id.* Torres stated, "Okay, I'll let him

4

know. I'm just waiting for him to call me, because he didn't have a number." *Id.* Later in the conversation, Torres stated, "I'll let you know . . . either way I'll call you ahead of time." *Id.*

At 3:44 the same afternoon, Torres spoke with Foster on the phone. They decided it would be too late to arrive in the Detroit area that night. Torres stated, "You know, if you I . . . you say tomorrow at six is okay, or five or whatever, so I call tell her [Defendant] today." [259] at 23. They decided on 6:00 a.m. and Foster told Torres that he would call him back in about an hour about a meeting place. At about 5:30 that night, Torres and Foster spoke again and arranged to speak in person near Foster's house.

At 5:54 that night, Torres and Guzman spoke on the phone and Guzman asked, "So what happen with that [meaning, what happened with Torres' conversation with Foster]? Is it going to work out or not with him [meaning, is Foster going to be able to transport the heroin to Detroit]?" [259] at 24. Torres replied, "Right now, I came to see him [Foster]. We are going to talk." *Id.* Torres also said that "[e]verything is set for tomorrow, right now we are just going to do arrangement with him [meaning, Torres was going to talk to Foster about how to receive and transport the heroin to Detroit]." *Id.* Guzman replied, "All right, bye. You got it." *Id.* Torres and Guzman spoke again at 6:32 p.m. and Torres told Guzman, "Yes, we agreed for early tomorrow [meaning, Torres and Foster agreed that Foster would receive the heroin early the following morning]" around "6:00 or 6:30." *Id.*

About ten minutes later, Torres and Defendant spoke on the phone. Torres asked if she would be "ready tomorrow by . . . 12:00 or 1:00 around there [to receive the heroin in the Detroit area], the friend [Foster] should be getting around there [to the Detroit area] like at 2:00 at the latest," and Defendant responded "Oh, okay." [259] at 25. Torres told Defendant, "Yeah, well . . . either way once he has left, I will call you so you can be ready." *Id.*

5

The following morning at 6:01 a.m., Torres and Zacahua spoke on the phone and Zacahua said, "Hey, call the uncle [Acasio Sanchez]. [H]e is not opening. I've been out here [in front of the Fairfield stash house] for 10 minutes." [259] at 25. Torres then spoke on the phone with Sanchez, and said "He's there. Open up." *Id.* Sanchez responded, "Yeah." *Id.* At approximately 6:15 a.m., surveillance observed a red Dodge Durango, with license plates registered to Foster, in the vicinity of the Fairfield stash house. At 6:18 a.m., Torres and Foster spoke on the phone and arranged to meet "between 46th and 47th on Troy." *Id.* at 26.

At 6:19 a.m., Torres and Zacahua spoke on the phone. Zacahua told Torres, "The door is not opening [meaning that the concealed compartment, or 'trap,' in the Dodge Durango would not open]." [259] at 26. Torres stated, "I'm coming." *Id.* At 6:21, Torres and Zacahua spoke again about opening the trap. At 6:23, Torres spoke to Sanchez and told him, "[o]pen the front [of the Fairfield stash house] for me." *Id.* Sanchez replied, "Yes." *Id.* Immediately after, Torres spoke to Zacahua on the phone and told him, "[t]ell the uncle [Sanchez] to open the front [of the Fairfield stash house] for me." *Id.* at 27. Zacahua replied, "Okay." *Id.* At 6:31, Torres and Foster spoke on the phone again. Torres said that he could not "open the door" and would "leave [the heroin] under the back seat" for Foster to "put it in." *Id.*

At 6:38 a.m., surveillance observed the red Dodge Durango leave the garage behind the Fairfield stash house. At the same time, surveillance observed Torres, in a blue Ford Explorer, leave the Fairfield stash house. A few moments later, surveillance observed Zacahua park the red Dodge Durango on Troy Avenue near 47th Street, exit the truck, and enter the blue Ford Explorer in which Torres was sitting. At 6:44 a.m., Torres spoke on the phone to Foster. Torres said, "I'm right here," and Foster responded, "Okay. Here I come." [259] at 28. At 6:47 a.m., surveillance observed Foster get into the blue Ford Explorer with Torres and Zacahua and drive

around the block. Surveillance then observed Foster exiting the Explorer and walking toward the Durango, while Torres and Zacahua drove away.

Law enforcement officers arrested Foster and read him his *Miranda* rights. An officer asked Foster where the narcotics were located and Foster said something like, "It's in the back seat." [259] at 28. Foster told the officer that he was supposed to drive the Durango to Detroit, park it in a specific location, and phone a woman to tell her the heroin had arrived. Foster had a handwritten note that said "Laday [Lady]," with Defendant's phone number written on it. *Id.* Foster said that he was supposed to call the number to contact the woman who would receive the heroin. Foster also said that the woman had a key to the Durango and she would retrieve the car from a hotel parking lot and remove the heroin. Officers found four brick-shaped bundles of heroin on the floor of the Durango and seized them. Officers also seized Foster's phone.

Officers drove the Durango to the Detroit area and parked it in the location that Foster identified, a Super 8 motel off the I-75 Expressway. At 5:00 p.m. that night, an officer acting in an undercover capacity called Defendant from the phone seized from Foster. The officer told Defendant where the vehicle was parked. At 5:15, surveillance observed Defendant entering the parking lot of the Super 8 in a white Chevy Trailblazer. Defendant and a female later identified as her niece exited the Trailblazer and walked into the motel. A text message from Defendants phone to Foster's phone was sent stating that Defendant did not have a key to the Durango. The undercover agent texted back on Foster's phone that the key was under the mat. Surveillance subsequently observed Defendant exit the Super 8 Motel, walk over to the Durango, and enter the vehicle. Officers then approached Defendant and took her into custody.

Officers then executed a search warrant on Defendant's residence in Michigan. Officers found and seized drug packaging materials, a counterfeit money discerner, two digital scales, and a drug press.

The Government filed a thirteen-count indictment against Defendant and Guzman, Torres, Zacahua, Sanchez and Foster. Defendant is named in three of the counts. Count One charges Defendant with conspiring with others to possess with the intent to distribute and to distribute narcotics, in violation of 21 U.S.C. § 846. Counts Nine and Eleven charge Defendant with knowingly using a telephone in furtherance of the alleged conspiracy, in violation of 21 U.S.C. § 843(b).

## II.   *Santiago* Proffer [259]

To prove at trial that Plaintiff participated in a conspiracy, the Government is allowed to introduce statements of Defendant's alleged co-conspirators, without violating the hearsay rule, if certain requirements are met. Specifically, Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement is not hearsay if it is "offered against an opposing party" and "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In *Santiago*, the Seventh Circuit held that "when a statement of a coconspirator which would otherwise be regarded as hearsay is proffered by the Government, Fed. R. Evid. 104(a) requires that the district court make a preliminary determination regarding the admissibility of the declaration of the coconspirator." *United States v. Rodriguez*, 975 F.2d 404, 405-06 (7th Cir. 1992) (citing *Santiago*, 582 F.2d at 1130-31). "In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

As a condition for admission of co-conspirators' statements under Rule 801(d)(2)(E), the Government "must provide sufficient evidence to convince the district court, by a preponderance

of the evidence (*i.e.*, it is more likely than not), that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy." *Rodriguez*, 975 F.2d at 406.

The Government is allowed to submit evidence of these three elements to the Court in a pretrial proffer, called a "*Santiago* proffer." *Rodriguez*, 975 F.2d at 406. The Court "may admit the statement(s) subject to its later determination during trial that the Government has established by a preponderance of the evidence the three foundational elements." *Id.* "*Santiago* proffers are, by nature and necessity, argumentative and summary." *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). However, "the declarant's statements do not alone suffice to establish a conspiracy in which the declarant and the defendant participated." Fed. R. Evid. 801 advisory committee's note to 1997 Amendment. The Court must also consider "the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, [and] evidence corroborating the contents." *Id.* (citing *United States v. Zambrana*, 841 F.2d 1320, 1344-45 (7th Cir. 1988)).

In its *Santiago* proffer, the Government explains that it "may seek to introduce the substance of conversations involving Torres and other members of the Guzman DTO, including Miguel Guzman, Fabian Foster, and Acasio Sanchez" in Defendant's trial. [259] at 30. The Government asserts that "[a]ll of the statements between Torres and Guzman, Foster and Sanchez were made in furtherance of the conspiracy because they were communications regarding the core of the conspiracy: instructions and details concerning the delivery and/or sale of the narcotics." *Id.* In its reply brief, the Government further states that at trial Torres will testify that he met Defendant through Guzman several years ago and understood that Defendant had been involved in drug trafficking with Guzman for about three years. Torres will also testify

9

that, at the direction of Guzman, he provided Defendant with between two and four kilograms of heroin on approximately ten occasions. In addition, Torres will testify that Defendant would sometimes have the money to pay for the heroin and at other times would receive the heroin on credit.

In response to the *Santiago* proffer, Defendant does not challenge the sufficiency of the Government's showing that a conspiracy existed between the other charged defendants or that the statements between those defendants were in furtherance of the conspiracy.[2] Defendant argues, however, that the evidence is insufficient to establish by a preponderance of the evidence that *she* was a participant in the conspiracy to possess and distribute narcotics, rather than simply a buyer of narcotics. According to Defendant, the evidence cited in the Government's *Santiago* proffer "suggests [Defendant] was involved in a buyer-seller relationship with Torres and Zacahua, but was not one of their co-conspirators." [283] at 4.

To convict Defendant as a co-conspirator in the Guzman DTO, the Government must prove that Defendant had "a stake in the venture," which "exhibits 'informed and interested cooperation'" in the conspiracy. *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013) (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 713 (1943)). "Determining whether someone has 'a stake in the venture' is easier said than done," *id.*, especially in cases involving an alleged drug distribution conspiracy. "The line between a conspiracy and a mere buyer-seller

---

[2] The Court concludes that the Government's proffer is sufficient to establish the first and third elements of the *Santiago* test. First, the statements and other evidence cited by the Government and summarized above, taken as a whole, raise a strong inference that Guzman, Torres, Zacahua, Sanchez, and Foster participated in a conspiracy to distribute drugs in the Chicago and Detroit areas. These five defendants have all entered guilty pleas. Second, the recorded conversations that the Government discusses in its proffer were made "in furtherance of" the conspiracy because they were "'part of the information flow between conspirators intended to help each perform his role.'" *United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989) (quoting *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir. 1989)). These conversations "ke[pt] co-conspirators advised as to the progress of the conspiracy" and "attempt[ed] to conceal the criminal objections of the conspiracy" from law enforcement. *Id.*

relationship" is especially "difficult to discern," *United States v. Chavis*, 429 F.3d 662, 671 (7th Cir. 2005), because some of the factors that are indicative of a conspiracy—such as the frequent, regular, and standardized purchase of drugs—"d[o] not actually distinguish conspiracies from buyer-seller relationships," *Brown*, 726 F.3d at 999.

Thus, in *United States v. Johnson*, 592 F.3d 749 (7th Cir. 2010), the Seventh Circuit "identified a new, nonexhaustive list of characteristics that more precisely pinpoint the distinction" between a conspiracy and a buyer-seller relationship. *Brown*, 726 F.3d at 999 (citing *Johnson*, 592 F.3d at 754-55). These considerations include "sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities." *Johnson*, 592 F.3d at 755-56.

Taking into account this nonexhaustive list of characteristics and the evidence cited by the Government, the Court concludes that the Government has established by a preponderance of the evidence that Defendant was a member of the charged conspiracy rather than simply a buyer. According to the Government, Torres will testify that he provided Defendant with between two and four kilograms of heroin on approximately ten separate occasions, and that sometimes Defendant received the heroin on credit. In *Brown*, the Court recognized that "[i]f a person buys drugs in large quantities (too great for personal consumption), on a frequent basis, on credit, then an inference of conspiracy legitimately follows." *Brown*, 726 F.3d at 1000.

In addition, the Government has identified evidence indicating that Defendant and her alleged co-conspirators advised one another on their business and had an agreement to warn of threats to their business from law enforcement authorities. *Johnson*, 592 F.3d at 756. In May

11

2013, about two months before Defendant was arrested, she was overheard and observed making arrangements with Torres to come to Chicago and pick up a truck containing a hidden trap compartment, of the type often used to conceal narcotics. Torres also spoke with Guzman about Defendant's plans to come to Chicago for the truck. Shortly after Defendant was pulled over by Indiana law enforcement officers while driving the truck, Defendant spoke with Torres, told him "drop those phones," told him the truck had been seized, warned him she had been followed from the spot where Defendant and Torres had met, and told him that she would not call him anymore before meeting him at 4:00 on the coming Wednesday. [259] at 20. She spoke with Torres again later that night about whether the law enforcement officers found any narcotics and Torres' concern that there were receipts in the truck with his name on them. Defendant does not address this evidence in her response to the Government's *Santiago* proffer. This evidence suggests that Defendant had a stake in the venture and was not merely in a buyer-seller relationship with members of the Guzman DTO. *Johnson*, 592 F.3d at 756. It also "reflect[s] an attempt to avoid detection" of the Guzman DTO by law enforcement, which further suggests that Defendant was trying to advance the conspiracy's goals. *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002).

Other characteristics of Defendant's relationship with her alleged co-conspirators also suggest that Defendant was not a mere buyer of narcotics. Defendant and Torres spoke in "cryptic language," yet had no apparent "difficulty understanding each other." *United States v. Arrellano*, 757 F.3d 623, 633 (7th Cir. 2014). Foster told law enforcement officers that he was supposed to drive the Durango with the heroin to Detroit, park it in a certain location, and phone a woman to let her know it arrived; it seems odd that Foster would leave the truck for Defendant if all she was doing was buying the drugs inside the truck. Finally, Guzman's statement to

12

Torres that "[if] that lady [Defendant] calls and she is coming tomorrow [to pick up narcotics proceeds], tell her to give you a day," [259] at 17, suggests that Defendant was a member of the Guzman DTO who was receiving proceeds from its narcotic sales.

For these reasons, the Court accepts the Government's *Santiago* proffer [259] and concludes that the co-conspirator statements set out by the Government are admissible pending the introduction of the evidence underlying the proffer.

### III.    Motion *in Limine* [280]

A motion *in limine* is a motion "at the outset" or one made "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997) (observing that, when used properly, the motions may sharpen the issues for trial). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009).

Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989); see also *Luce*, 469 U.S. at 41-42 ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). In addition, if an evidentiary issue raised in a motion *in limine* "cannot be evaluated accurately or sufficiently"

prior to trial, it is appropriate to defer ruling until trial. *Jonasson*, 115 F.3d at 440 (delaying until trial may afford the judge a better opportunity to estimate the evidence's impact on the jury).

As discussed above, the Government has disclosed that it intends to introduce into evidence a number of recorded conversations between Defendant's alleged co-conspirators. In her motion *in limine*, Defendant states that she "anticipate[s] that when the government introduce[s] the recorded conversations at trial, it w[ill] attempt to elicit the opinion of its law enforcement witness as to the subject matter of the conversation and to interpret certain words or phrases said by the speakers." [280] at 1. Defendant argues that such testimony would be "based solely on speculations by the witness as to the state of mind of the speaker" and therefore moves for an order barring the Government from introducing such testimony under Rule 701 of the Federal Rules of Evidence. *Id.* at 2. See generally Fed. R. Evid. 701 ("Opinion Testimony by Lay Witnesses"). Defendant also argues that the recordings should be excluded because "the recorded conversations speak for themselves" and "[t]he jury will not need the assistance or opinion of a witness, which was not part of the conversation, to understand any words, phrases or meanings of the conversation." [280] at 2.

The Government responds that it "does not intend to elicit opinion testimony from law enforcement witnesses regarding these conversations." [284] at 1. Instead, the Government "intends to call one of the participants in the conversations to testify regarding their meaning," which "is not expert testimony." *Id.* at 2. Therefore, the Government asks the Court to deny Defendant's motion [280] as moot.[3]

Based on the Government's representation that it does not intend to have law enforcement officers testify about the meaning of the recorded conversations, the Court

---

[3] Defendant did not file a reply brief in support of her motion. Her reply was due March 28, 2016. See [276].

concludes that Defendant's motion *in limine* [280] is moot and denies the motion without prejudice on that basis. See, e.g., *United States v. Messino*, 873 F. Supp. 1177, 1182 (N.D. Ill. 1995) (denying as moot government's motion in limine seeking to preclude evidence and argument of entrapment at trial on charges arising from alleged drug distribution and money laundering conspiracy, where no defendant responded to motion by asserting right to argue entrapment in opening statements); *Redmond v. City of Chicago*, 2008 WL 539164, at *3 (N.D. Ill. Feb. 26, 2008) (denying as moot plaintiff's motion in limine to bar introduction of evidence about gang affiliation or tattoos where defendants indicated that "they are not going to present any such evidence at trial").

**IV.  Conclusion**

For the foregoing reasons, the Court accepts the Government's *Santiago* proffer [259] and concludes that the co-conspirator statements set out by the Government are admissible pending the introduction of the evidence underlying the proffer. The Court denies Defendant's motion *in limine* [280] without prejudice as moot because the Government has represented that it does not intend to introduce the testimony that Defendant seeks to exclude.

Dated:  April 5, 2016  
_____  
Robert M. Dow, Jr.  
United States District Judge