# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 13-cr-576 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| MARIA MORENO ) | |

## MEMORANDUM OPINION AND ORDER

On April 21, 2016, a jury convicted Defendant Maria Moreno ("Defendant") of one count of conspiring with others to possess with the intent to distribute and to distribute narcotics, in violation of 21 U.S.C. § 846, and two counts of knowingly using a telephone in furtherance of the alleged conspiracy, in violation of 21 U.S.C. § 843(b). Currently before the Court is Defendant's Rule 29 Motion for Judgment of Acquittal and/or Rule 33 Motion for a New Trial [342]. For the reasons stated below, Defendant's motion [342] is denied. Counsel are requested to jointly contact the Courtroom Deputy by 2/4/2017 to schedule a sentencing date.

**I.    Background**

The Government indicted Defendant and five co-defendants—Miguel Guzman, Alfredo Torres, Sergio Zacahua, Acasio Sanchez, and Fabian Foster—for their alleged participation in a conspiracy to distribute heroin and cocaine in the Chicago, Illinois and Detroit, Michigan areas. According to the Government, Guzman was the head of the drug trafficking organization (the "Guzman DTO") and Defendant received narcotics from Chicago-based members of the Guzman DTO to further distribute in the Detroit area. The Government filed a thirteen-count indictment against the six co-defendants. Defendant is named in three of the counts. Count One charged Defendant with conspiring with others to possess with the intent to distribute and to distribute narcotics, in violation of 21 U.S.C. § 846. Counts Nine and Eleven charged Defendant

with knowingly using a telephone in furtherance of the alleged conspiracy, in violation of 21 U.S.C. § 843(b).

Defendant's co-defendants all entered guilty pleas. Defendant elected to be tried by a jury. The Government's evidence consisted primarily of recorded telephone conversations between Defendant and her alleged co-conspirators in which Defendant arranged to receive narcotics and warned of law enforcement actions; testimony of a cooperating alleged co-conspirator (Torres) describing the ongoing relationship between Defendant and the Guzman DTO; and law enforcement surveillance of Defendant attempting to pick up four kilograms of heroin from one of the Guzman DTO's couriers (Foster) in July 2013.

More specifically, Torres testified that he worked for the Guzman DTO for approximately fifteen years, along with Sanchez, Zacahua, and Foster. Torres met Defendant in approximately mid-2012 at Guzman's audio shop. Guzman introduced Torres to Defendant and instructed him to deliver heroin to her on an ongoing basis. Torres and Defendant exchanged telephone numbers. Within three days, Torres delivered between two and four kilograms of heroin to Defendant at a Chicago restaurant.

Torres testified that after this initial delivery, he or another Guzman DTO worker delivered two to four kilograms of heroin to Defendant approximately once or twice a month. For most of their relationship, Defendant would drive to Chicago and Torres or another Guzman DTO worker would take Defendant's vehicle, retrieve money that Defendant left in the vehicle, and load the vehicle with heroin. Torres also testified that, on at least one occasion, Guzman told him to give Defendant the kilograms of heroin and she could pay at a later date. According to Torres, Defendant paid approximately $200,000 for four kilograms of heroin. FBI Special Agent Christopher Labno testified that one kilogram of heroin in equivalent to around 4,000

individual doses and that, at the time of Defendant's arrest, the wholesale price for four kilograms of heroin was approximately $200,000.

The Government presented evidence that on May 27, 2013, Torres met Defendant at a Shell gas station in Chicago. The meeting was observed and photographed by law enforcement surveillance agents. Torres testified that he and Defendant met at the gas station so Torres could give Defendant keys to a car with a trap compartment in it. Torres gave Defendant the keys to the trap vehicle and she drove away. Law enforcement officers later stopped Defendant in Indiana and discovered that she was not the registered owner of the vehicle and could not explain her relationship to the registered owner. The officers found the empty concealed trap compartment, which contained a receipt from a glass company with the name "Alfred Torres" on it. The receipt was for fixing a broken window in the vehicle. Later that evening, in two telephone conversations that law enforcement recorded, Defendant told Torres to stop using the phones, that she had been pulled over by police, and that the trap vehicle had been confiscated because it was not in her name.

The Government's evidence showed that after Defendant was stopped by police, she stopped coming to Chicago to pick up heroin and instead had a courier from the Guzman DTO deliver it to her in the Detroit area. The final delivery occurred on July 16, 2013. On that date, law enforcement officers in Chicago arrested Foster shortly after he obtained four kilograms of heroin from Torres and other DTO workers. In Foster's car, the officers found a note with Defendant's phone number on it. Officers drove Foster's vehicle to a motel outside of Detroit where, according to Foster, he had been instructed to park the vehicle. One officer called Defendant on a phone that they had seized from Foster and told her where the vehicle was parked. Surveillance observed Defendant drive into the hotel parking lot and enter the motel

with her fifteen year old niece. Defendant sent a text message to Foster's confiscated phone, stating that she did not have a key to Foster's vehicle. The officer texted Defendant back on Foster's phone that there was an extra key under the mat in the vehicle. Defendant exited the hotel, walked to Foster's vehicle, and entered the vehicle.

At this point, officers arrested Defendant. They found a spare key to Torres' car in Defendant's vehicle. They found no significant sums of cash on Defendant's person, but three phones. One phone was a personal phone; the second phone was the one that Defendant had used to communicate with Torres and Foster; and the third phone had a text message from earlier in the day which read, "Down here wit [with] my money." During closing argument, the Government asked the jury to infer that Defendant had a buyer in the area who would give her money for the heroin, which she then planned to give to Foster.

At trial the Government also introduced a receipt in Foster's name, dated June 13, 2013, for a room at the same hotel at which Defendant was arrested.

Following the close of the Government's case, defense counsel moved for entry of a directed verdict of acquittal. See [316]. The Court took the motion under advisement. See *id.* The Court also admonished Defendant of her right to testify and her right not to testify at trial. See [320]. Defendant chose not to testify and the defense rested its case. See *id.* Following the parties' closing statements, the Court instructed the jury. As is relevant here, the Court provided the jury with the following instructions, which Defendant proposed and to which the Government agreed:

> To establish that a buyer knowingly became a member of a conspiracy with a seller to possess heroin with intent to distribute, the government must prove that the buyer and seller had the joint criminal objective of distributing heroin to others. The government must prove that, in addition to agreeing to buy heroin, the defendant agreed to participate with the seller in an arrangement involving mutual dependence, cooperation or assistance in distributing heroin. Such an

4

agreement may be proved by evidence showing sales on credit, in which the buyer is permitted to pay for all or part of the heroin after the heroin has been re-sold, couple with other evidence showing mutual cooperation and an ongoing arrangement between the defendant and the seller.

Following deliberations, the jury found Defendant guilty of conspiring with others to possess with the intent to distribute and to distribute narcotics, in violation of 21 U.S.C. § 846, and two counts of knowingly using a telephone in furtherance of the alleged conspiracy, in violation of 21 U.S.C. § 843(b).

## II. Legal Standards

Under Rule 29(a) of the Federal Rules of Criminal Procedure, at the close of the government's evidence or all of the evidence, the defendant may more for entry of a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A "Rule 29 judgment of acquittal is a substantive determination that the prosecution has failed to carry its burden." *Smith v. Massachusetts*, 543 U.S. 462, 468 (2005). The Court is allowed, as it did here, to reserve decision on a Rule 29(a) motion until after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). The Court "must decide the motion on the basis of the evidence at the time the ruling was reserved," *id.*—in this case, at the close of the Government's case in chief. See [316]. The Court construes the evidence "in the light most favorable to the government." *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016). To prevail, Defendant "must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt." *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012); see also *United States v. Bell*, 819 F.3d 310, 319 (7th Cir. 2016). Since this case involves a drug distribution conspiracy, the Court will "also overturn a conviction when the plausibility of a mere buyer-seller arrangement [would be] the same as the

5

plausibility of a drug-distribution conspiracy" to a reasonable jury. *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015).

"Federal Rule of Criminal Procedure 33(a) gives district courts the discretion to grant a new trial 'if the interest of justice so requires.'" *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012) (quoting Fed. R. Crim. P. 33(a)). "'[A] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *United States v. Betts-Gaston*, 2015 WL 6859165, at *8 (N.D. Ill. Nov. 6, 2015) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). Instead, Rule 33(a) is "'reserved for only the most extreme cases.'" *Hagler*, 700 F.3d at 1101 (quoting *United States v. Linwood,* 142 F.3d 418, 422 (7th Cir. 1998)). "[C]ourts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

## III.    Analysis

### A.    Sufficiency of the Evidence

Defendant argues that the Court should set aside the jury's guilty verdicts or grant a new trial because the Government failed to prove beyond a reasonable doubt that Defendant conspired with the Guzman DTO to distribute narcotics. Defendant asserts that although the evidence presented at trial showed that she bought drugs from members of the Guzman DTO on several occasions, those "regular sales, even of large amounts, do not create a conspiracy" under Seventh Circuit precedent. [342] at 3. Defendant further argues that the two phone count convictions should also be overturned because they are legally and factually dependent on the existence of a conspiracy.

To obtain a conviction under 21 U.S.C. § 846, the Government was required to prove beyond a reasonable doubt that (1) Defendant and one or more persons "entered into an agreement to distribute drugs"; and (2) Defendant "knowingly and intentionally joined in the agreement." *Pulgar*, 789 F.3d at 813; see also *United States v. Cardena*, 842 F.3d 959, 994 (7th Cir. 2016); *Smith v. United States*, 133 S. Ct. 714, 719 (2013). To show that Defendant knowingly and willfully participated in a conspiracy with members of the Guzman DTO, the Government was required to prove that Defendant had "a stake in the venture," which "exhibits 'informed and interested cooperation'" in the conspiracy. *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013) (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 713 (1943)).

The Seventh Circuit has recognized that "[t]he line between a conspiracy and a mere buyer-seller relationship" can be "difficult to discern," *United States v. Chavis*, 429 F.3d 662, 671 (7th Cir. 2005), because some of the factors that are indicative of a conspiracy—such as the frequent, regular, and standardized purchase of drugs—"d[o] not actually distinguish conspiracies from buyer-seller relationships," *Brown*, 726 F.3d at 999. In such cases, the government must provide evidence of an agreement to distribute drugs, not just an agreement to complete the underlying drug deals. *Pulgar*, 789 F.3d at 812. In other words, "[e]vidence of an agreement to advance further distribution—beyond the initial transaction—is … required." *Id*.

"Sometimes agreements to distribute drugs are express," but "most times they are not." *Pulgar*, 789 F.3d at 813. "When they are not, the government may offer circumstantial evidence of these agreements." *Id.* There is "no rigid list or formula" of the evidence required to prove a conspiracy where there is no express agreement. *Id.* Instead, the Court uses a "totality-of-the-circumstances approach." *Id.* Circumstantial evidence that the Seventh Circuit has found to be probative of a conspiracy includes "sales on credit or consignment, an agreement to look for

7

other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, [a]n agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities," *United States v. Johnson*, 592 F.3d 749, 755-56 (7th Cir. 2010), and the "provision of tools to advance the distribution," *Pulgar*, 789 F.3d at 813. A relationship exhibiting three specific factors—"multiple, large-quantity purchases, on credit"—is "widely accepted as sufficient proof of a trafficking conspiracy." *Brown*, 726 F.3d at 1002.

After closely evaluating the Government's evidence in light of these standards, the Court concludes that Defendant has failed to demonstrate either that no rational trier of fact could have found that the Government proved the essential elements of a drug distribution conspiracy beyond a reasonable doubt or that the interests of justice warrant granting Defendant a new trial.

At trial, the Government came forward with evidence that Defendant made "multiple, large-quantity purchases, on credit." *Brown*, 726 F.3d at 1002. Torres testified that he delivered two to four kilograms of heroin to Defendant approximately once or twice a month, beginning in mid-2012. These transactions continued until Defendant was arrested in July 2013. While the evidence adduced at trial showed that most of Defendant's large-scale heroin purchases were made in cash, the Government presented evidence of at least three purchases being made on credit. First, Torres testified that on at least one occasion Guzman told him to give Defendant the kilograms of heroin and she could pay at a later date. See [342] at 9. Defendant argues that this is insufficient to show that Defendant received the heroin on credit, because Torres did not provide details on when Defendant ultimately delivered the money or to whom, and compares this case to *Pulgar*. In that case, the Government charged appellant Pulgar of conspiring with Schmidt to distribute cocaine. At trial, Schmidt testified about one occasion (a sham deal he

8

arranged for the DEA) where Pulgar had fronted him cocaine without advance payment. On that occasion, Schmidt dropped off the cocaine on his way to traffic court and picked up the money for the cocaine ($27,000) after his hearing. 789 F.3d at 810. Schmidt also testified that there were "probably a couple of times" that Pulgar fronted cocaine to him, but that he could not remember details. *Id*. The court found that this evidence was insufficient to establish a credit transaction indicative of conspiratorial behavior, because the fronting of $27,000 in cocaine was "an adapted arrangement designed for self-preservation" and the other evidence of fronting was "vague and incomplete." *Id.* at 814. Here, by contrast, there is no evidence that Guzman sold Defendant heroin on credit for his own self-preservation, and Torres explained when and how he gave Defendant heroin on credit and that he had been instructed by the head of the Guzman DTO to do so.

Second, the Government presented evidence that the heroin Defendant was picking up when she was arrested in July 2013 was being provided to her on credit. The Government's informant followed Foster's instructions to leave the trap vehicle at the motel and message Defendant to use her key to the trap vehicle to get into it to get the heroin. Defendant did not have any significant sums of money on her at the time of the arrest, indicating that she planned to walk away with over $200,000 in heroin without pre-paying for it. Also, Defendant received a text message from a suspected buyer informing her that he was "down here [with] my money," [348] at 9, from which the jury could have inferred that Defendant planned to obtain the money to pay for the drugs after she picked up the drugs from Torres.

Third, the Government also submitted into evidence a receipt showing that Foster had rented a room at the same motel a month earlier, suggesting that Defendant and Foster had engaged in at least one prior credit transaction using the same plan that was foiled by the

9

Government in July 2013. A reasonable jury could have inferred that since Foster rented a room at the hotel, the June transaction happened the same way as the July transaction was intended: Foster left Defendant the heroin in his trap vehicle, and Defendant came back later with the money after getting it from her buyer.

This evidence of multiple large-scale credit transactions is not the only evidence, however, distinguishing this case from *Pulgar*. In *Pulgar*, the Government had no evidence that Pulgar provisioned Schmidt with any tools or supplies to further Schmidt's drug sales. 789 F.3d at 812. Here, by contrast, the Government presented evidence that the Guzman DTO shared trap cars with Defendant to advance the distribution of heroin, which is circumstantial evidence of an agreement to distribute drugs. See *id.* at 813. Recorded conversations show that Defendant picked up a trap vehicle from Torres in May 2013 and that Torres has recently paid to repair a window in the vehicle. Defendant offers no reason why Torres would have paid to fix the window, or she and Torres would both have occasion to drive the vehicle in the first place, if she was a mere customer of the Guzman DTO. In addition, when Defendant was arrested, she had in her vehicle a key to the trap car that Foster drove to Detroit with her drug delivery. Defendant does not suggest that any mere customer of the Guzman DTO would have been entrusted with a key to one of the DTO's trap vehicles. Contrary to Defendant's argument otherwise, these are all items of evidence that Defendant and the Guzman DTO shared trap vehicles and had a relationship of mutual dependence and cooperation.

The Government also presented circumstantial evidence that Defendant and members of the Guzman DTO had an agreement to warn one another of future threats by law enforcement, including Defendant's warning to Torres after she was pulled over in the trap vehicle to "drop those phones." See *Johnson*, 591 F.3d at 755-56. Defendant argues that *Johnson* establishes that

a single warning of police presence is insufficient to establish the existence of a conspiracy. But *Johnson* did not establish such a bright-line rule, nor is the Court aware of any other cases requiring multiple warnings. Cf. *United States v. Nunez*, 673 F.3d 661 (7th Cir. 2012) (evidence was sufficient to support defendant's conviction of conspiracy to possess and distribute cocaine where, on one occasion, after defendant saw his supplier's car stopped by the side of a road and being searched by police, defendant and his father (who supplied drugs to the defendant's supplier) agreed that supplier's family should be told and should be urged to discard any drugs that supplier might have in the house). Instead, in *Johnson*, the Seventh Circuit found that the defendant's one-time warning to his drug supplier was insufficient evidence of a conspiracy, because it was for the defendant's own "self-preservation," as the supplier was en route to deliver drugs to him at the very moment that he observed police near the planned meeting point. *Id*. at 757. In this case, by contrast, there is no evidence that Torres was on his way to deliver drugs to Defendant when Defendant was pulled over, or that Defendant had any immediate, self-serving need to inform Torres of the law enforcement activity. Instead, Defendant placed herself at risk to warn Torres of police activity that could threaten the success of the Guzman DTO and the larger drug distribution conspiracy.

For these reasons, the Court concludes that Defendant has failed to demonstrate either that no rational trier of fact could have found that the Government proved the essential elements of a drug distribution conspiracy beyond a reasonable doubt or that the interests of justice warrant granting Defendant a new trial.

### B. Constructive Amendment

Defendant also argues that she is entitled to acquittal or a new trial because the Government constructively amended the indictment by arguing in opening statements that

Defendant was a member of the Guzman DTO, but arguing in closing arguments that Defendant was not herself a member of the Guzman DTO but had an agreement with the Guzman DTO's members to distribute drugs. Specifically, Defendant points to the Government's opening argument that "[t]his case is about a group of people who worked together to distribute heroin" and that Defendant "is a member of that organization." [342] at 18.

"A constructive amendment of an indictment occurs when the evidence at trial 'goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (quoting *United States v. Pigee,* 197 F.3d 879, 886 (7th Cir. 1999)). A constructive amendment of an indictment "violates the Fifth Amendment." *Id.* However, "'not all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments.'" *Id.* (quoting *Pigee*, 197 F.3d at 886). To constitute an impermissible constructive amendment, "the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Id.* (quoting *United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002)).

The Court concludes that the Government did not constructively amend the indictment in violation of Defendant's Fifth Amendment rights. As an initial matter, Defendant mischaracterizes the Government's opening statements. While the Government told the jury "[t]his case is about a group of people who worked together to distribute heroin" and Defendant "is a member of that organization," [342] at 18, the Government did not define the relevant "group of people" or "organization" as the "Guzman DTO." The Government could just as

easily have used these terms to refer to the conspiracy as a whole, which included both members of the Guzman DTO and Defendant.

More importantly, Defendant's argument does not discuss the indictment at all. The indictment is what is relevant; to determine if there is a constructive amendment, the Court must compare the allegations of the indictment with the evidence presented at trial. See *Phillips*, 745 F.3d at 832. Defendant cites no case law suggesting that a variance between opening and closing arguments constitutes a constructive amendment of the indictment, and did not raise this objection to the closing statements at trial. The governing indictment in this case in not limited to an allegation that Defendant was herself part of the "Guzman DTO," rather than someone who conspired with what Defendant's counsel defines as the Guzman DTO. Instead, the indictment alleges broadly that Defendant and her five co-defendants "did conspire with each other, and with others known and unknown to the Grand Jury, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance[.]" [71] at 1. Therefore, the Court concludes that the Government did not constructively amend the indictment and Defendant is not entitled to a judgment of acquittal or a new trial.

## IV. Conclusion

For the reasons stated above, the Court denies Defendant's Rule 29 Motion for Judgment of Acquittal and/or Rule 33 Motion for a New Trial [342]. Counsel are requested to jointly contact the Courtroom Deputy by 2/4/2017 to schedule a sentencing date.

Dated: January 30, 2017

Robert M. Dow, Jr.
United States District Judge